## Prudential Insurance Co. of America v. Downs.

(Decided Nov. 9, 1933.)

LOW & BRYANT and RAY C. LEWIS for appellant.

T. B. CULTON for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming.

The appellee, Linville Downs, was insured under a group policy issued by the appellant, Prudential Insurance Company of America, to the employees of the Louisville & Nashville Railroad Company. He sought and recovered the indemnity of $500 therein provided for the loss of an eye by accident. Downs was a car repairer helper at Corbin.

The evidence is that after dark on January 5, 1931, as Downs started down the steps of the platform of a locker room where he had eaten supper, a locomotive passed very close and he was enveloped in smoke, cinders, and steam. Something struck him in the face, and he fell two or three steps to the ground, striking his forehead and becoming unconscious for the moment. Friends immediately tried to remove cinders out of his eye, but getting no results took him to Dr. Smith, who extracted some grit and put a patch over his eye. He was not able to return to work that night. The next day Dr. Smith took out some more cinders or dirt and treated his eye. The day following he went to see Dr. Buck, an oculist, who, after examination, sent him to another oculist, Dr. Edmonds, at Middlesboro, on the third day. He was thereafter sent to Dr. Riddell, at Harlan, and afterward to Dr. Kelly, at Louisville.

Plaintiff testified positively and unequivocally that the sight in his eye was unimpaired before this experience and that three or four days afterward he discovered that he had lost the sight of it. It seems that upon his first call upon the doctors he did not tell them that he had fallen and struck his head, but simply told them he had gotten something in his eye. The several physicians testified that the sight could not have been destroyed merely by a cinder or grit, and three of them were positive in their professional opinion that the loss

of the sight was due to choroiditis, a disease which had existed for a long time. Dr. Kelly was so certain of his expert opinion that he resorted to gratuitous denunciations of the plaintiff, resting solely on his own conceptions and reflecting a disregard of the actualities. Perhaps this is why the jury overlooked the learned doctor and accepted the unlearned laborer. Dr. Smith, who saw Downs the night of the accident, did not testify. Dr. Buck stated that Downs had come to him in great pain and he found some dirt in the eye and some irritation. Finding no cause for the continuing pain, he sent the patient to another oculist. When Downs came to him again about six weeks later, he gave a complete history of his experience for the first time. By a more thorough examination, as Dr. Buck testified, he found the condition to be quite different from his first conclusion. He then diagnosed the case as a fracture or injury of the optic nerve caused by the fall. He found no evidence of any disease in the eye.

We have, therefore, on the one side the positive and uncontradicted evidence of the plaintiff, supported by Dr. Buck's diagnosis and conclusions. On the other, we have the opinions of three doctors that the loss of sight was due to disease and the accident had nothing to do with it. Their explanation of the claimed sudden transformation from sight to blindness is that a man may become blind in one eye and be that way for a long time without knowing it. Maybe so. But the jury chose to believe that Downs had lost his sight by reason of the accident and knew it. This was a case for the jury, and the verdict is not flagrantly against the evidence, as the appellant contends. See Pacific Mutual Life Insurance Company v. Cash, 224 Ky. 292, 6 S. W. (2d) 239; Harvey Coal Corporation v. Pappas, 230 Ky. 108, 18 S. W. (2d) 958, 73 A. L. R. 473; John Hancock Mutual Life Insurance Company v. Cave, 240 Ky. 56, 40 S. W. (2d) 1004, 79 A. L. R. 848.

It is argued—and quite seriously, too—that it was error to permit the plaintiff to testify that he was not blind in his right eye before he got hurt and that his reason for knowing it was that he had used his eye and had never had any sort of trouble with it previously. The basis of this sophism—that a man can't testify as a fact that he was not blind before an accident—is the statement of the specialists, above mentioned, that a

man may lose the sight of an eye and not discover it for a long time. The case of American Accident Company v. Fiddler's Adm'x, 35 S. W. 905, 36 S. W. 528, 18 Ky. Law Rep. 161, is relied upon. It was there held that one unskilled in the medical profession was not competent to testify that a man did not die of typhoid fever. That is different. Why, even the mob accepted the statement of the blind Bartimeus that, whereas once he was blind, now he could see. Surely the courts should not reject the sworn testimony of a man that, whereas once he could see, now he is blind. If there is one thing a man ought to know, it is whether he can see or not. The witness related a pathetic fact and did not merely express an opinion requiring the recondite knowledge of an expert.

Another item to which exception is maintained is that plaintiff testified that by the terms of his policy the company agreed to pay $500 for the loss of an eye through accidental injury. The certificate of insurance had been filed in the record upon the motion of the defendant. It is apparent that the witness had that before him as he was testifying concerning its contents. Technically, the document itself should have been introduced as the best evidence. But nobody claims that the terms of the policy were not as the witness stated, and no prejudicial effect is conceivable. An objection now becomes hypertechnical.

The plaintiff's evidence that following the accident he suffered intense pain and could not sleep, it is argued, was incompetent. While it is true, as appellant says, that the pain and suffering added nothing to the right to recover, it seems to us proper evidence of symptoms and as bearing on the issue whether the loss of sight was a consequence of the accident.

The recitation by plaintiff to Dr. Buck some six weeks after the accident that he had fallen and struck his head is claimed to be purely self-serving and that the doctor should not have been permitted to testify that he received that information as part of the history of the case. It is to be remembered that the doctor was merely testifying as to information he had upon which he based his diagnosis, and it was not given to the jury as substantive evidence. The doctor testified that this was the first time the patient had given him a complete history of the case and that he then found a decided

change in his condition. It would seem this history caused the physician to look further and to discover the actual conditions. Upon his first visit Downs had complained of the soreness over his eye, and the doctor says there may have been contusions then, although his examination at that time appears to have been so superficial that he did not take note of it. The evidence was competent. Horn's Adm'r v. Prudential Insurance Company, 252 Ky. 137, — S. W. (2d) — , decided October 10, 1933.

The other points raised by appellant that it was error to admit part only of a statement made to a claim agent of the railroad company, and improper argument, may be disposed of with the observation that the court withdrew what had been read and said and instructed the jury not to regard it. Neither of the encroachments upon the rules of evidence and argument was serious, but in any event the appellant is not in position to complain, for it must be presumed that the jury obeyed the admonition of the court.

Wherefore the judgment is affirmed.